UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| Robert A. Watt, Gary J. Friesen, Michael H. McKenna, and Geoffrey B. Coe, on behalf of themselves and all others similarly situated, | No. 2:23-cv-2593 |
| Plaintiffs, | |
| vs. | **COMPLAINT — CLASS ACTION** |
| FedEx Corporation, the FedEx Corporation Employees' Pension Plan, the Retirement Plan Investment Board of FedEx Corporation, and John/Jane Does 1–10, | |
| Defendants. | |

INTRODUCTION ................................................................................................................3

JURISDICTION AND VENUE ..........................................................................................6

PARTIES .............................................................................................................................7

I.      Plaintiffs ...................................................................................................................7

II.     Defendants ................................................................................................................8

APPLICABLE ERISA REQUIREMENTS .........................................................................9

I.      Pension Benefit Options Must Be Actuarially Equivalent ......................................9

II.     Reasonable Factors Must Be Used When Calculating Actuarial Equivalence .................12

SUBSTANTIVE ALLEGATIONS ....................................................................................14

I.      The Plan ..................................................................................................................14

II.     The Plan's QJSAs for Pilots Do Not Satisfy ERISA's Actuarial Equivalence
Requirements ..........................................................................................................18

      A.    Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be
Reasonable as of the Date Benefits Are Calculated .................................18

      B.    The Plan's Assumptions Do Not Produce Actuarially Equivalent JSA
Benefits in Violation of ERISA. ..............................................................21

III.    The Defendants' use of unreasonable assumptions caused Plaintiffs' and the
Class's joint and survivor benefits to not be the actuarial equivalent of the single
life annuity offered ................................................................................................23

CLASS ACTION ALLEGATIONS ...................................................................................30

FIRST CLAIM FOR RELIEF ...........................................................................................32

SECOND CLAIM FOR RELIEF ......................................................................................34

PRAYER FOR RELIEF ....................................................................................................37

Plaintiffs, Robert A. Watt, Gary J. Friesen, Michael H. McKenna, and Geoffrey B. Coe, former FedEx pilots, bring this class action for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs allege the following based upon personal knowledge as to themselves and as to other matters upon the investigation of Counsel, which included, among other things, a review and analysis of the FedEx Corporation Employees' Pension Plan; a review and analysis of public filings by FedEx Corporation with the United States Securities and Exchange Commission; and a review and analysis of public filings by FedEx Corporation Employees' Pension Plan with the United States Department of Labor. Plaintiffs believe that substantial additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a class action against FedEx Corporation ("FedEx"), the FedEx Corporation Employees' Pension Plan, the Retirement Plan Investment Board of FedEx Corporation ("Investment Board"), and the Investment Board's individual members (collectively, "Defendants") concerning the failure to pay joint and survivor annuity ("JSA") benefits under the FedEx Corporation Employees' Pension Plan (the "Plan") in amounts that satisfy the actuarial equivalence requirements in ERISA.  By failing to pay JSA benefits in amounts that are actuarially equivalent to the single life annuities offered to participants under the Plan, Defendants have and will continue to cause retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      FedEx sponsors the Plan.  The Plan is a defined benefit pension plan comprised of several formulae based on the participant's job category, when the participant began participating in the Plan and which FedEx subsidiary the participant works for.  This case is about the Plan's formula that applies to FedEx's pilots.

3.     Under the Plan, FedEx pilots earn retirement benefits under the Plan in the form of a single life annuity ("SLA"). An SLA provides participants with monthly payments for the rest of their lives when they retire.

4.     The Plan also offers pilots several forms of joint and survivor annuities ("JSA"). A JSA is an annuity for the participant's life with a contingent annuity payable to the participant's beneficiary (usually a spouse) for the life of the beneficiary, which is expressed as a percentage of the amount paid during the participant's life.  The Plan offers 50%, 75%, and 100% JSAs to pilots. The 50% JSA pays the surviving spouse one-half of the amount that was paid to the participant before the participant's death; the 75% JSA pays the spouse three quarters; and the 100% JSA pays the same amount.  The Plan also offers these three forms with pop-up.

5.     The monthly benefit payable as a JSA, regardless of the percentage, will be less than the amount payable as an SLA because the JSA accounts for the likelihood that the Plan will have to pay benefits for a longer period if a participant dies before the spouse.  ERISA limits the extent to which a plan can reduce certain JSA benefits below a participant's SLA benefits. Under ERISA § 205(d), JSAs with survivorship percentages between 50% through 100% must be at least the actuarial equivalent of the participant's SLA.  Two benefit options are actuarially equivalent when they have the same present value, calculated using the same, reasonable actuarial assumptions.

6.     Calculating present value requires inputting actuarial assumptions concerning projected mortality and interest rates.  Mortality tables for the participant (and, in the case of a JSA, the participant's beneficiary) predict how long the participant and beneficiary will live to account for the likelihood of each future benefit payment being made.  Over the last several decades, mortality rates have generally improved with advances in medicine and better collective

lifestyle habits. People who retired recently are expected to live longer than those who retired in previous generations. Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables. As a result, using an older mortality table decreases the present value of a JSA and — interest rates being equal — the monthly payments retirees receive.

7. The interest rate assumption accounts for the time value of money — the idea that a dollar in hand today is worth more than a dollar paid in a year, or in ten years — and discounts the value of expected future payments to the present. Like mortality, the interest rate affects the calculation. Using lower interest rates — mortality rates being equal — decreases the present value of JSA benefits.

8. To determine the amount of a benefit, mortality and interest rate assumptions, **together**, generate a "conversion factor," which is expressed as a percentage of the benefit being compared. Accordingly, the actuarial assumptions used to generate the conversion factor directly impact the amount of benefits that participants and their beneficiaries receive each month.

9. The conversion factor can also be calculated by dividing the actual amounts payable under the plan. For example, if a JSA benefit pays $900 a month and the SLA pays $1,000 a month, the conversion factor would be .90. If the conversion factor between a JSA and an SLA is lower than the conversion factor that would be generated using reasonable mortality and interest rate assumptions, then the JSA will not be "actuarially equivalent" to the SLA. Accordingly, the conversion factor and the actuarial assumptions used to generate it determine whether two benefit forms are actuarially equivalent.

10. The Plan uses the: (a) UP-1984 mortality table (the "UP-84") with a 3-year setback for beneficiaries and a 7% interest rate; and (b) the 1971 Group Annuity Mortality Table ("1971

GAM") with a 6-year setback for beneficiaries and a 6% interest rate to calculate JSA benefits.  The UP-84 overstates mortality rates because it is based on data that is ***more than 50 years old***. The 3-year setback further reduces the conversion factors because it treats beneficiaries as being younger than their actual age (e.g., age 62 instead of age 65).  The 1971 GAM overstates mortality because it was derived from mortality rates from the 1960s and the setback further reduces the conversion factor.  These assumptions produce conversion factors that generate JSAs that are lower than those generated by reasonable actuarial assumptions.

11.     By using flawed formulas for calculating JSA benefits — based on antiquated, unreasonable actuarial assumptions — Defendants depress the present value of JSAs, resulting in monthly payments that are ***materially lower*** than they would be if Defendants used conversion factors based on up-to-date, reasonable actuarial assumptions. In sum, Defendants are causing Plaintiffs and Class Members to receive less than they should in pension benefits each month, which will continue to affect them throughout their retirements.

12.     Accordingly, Plaintiffs seek an order from the Court (1) declaring that the conversion factors used to determine JSA benefits under the Plan produce benefits that are less than the actuarial equivalent of the SLA offered to participants; (2) requiring Defendants to pay all amounts improperly withheld in the past and to be withheld in the future; (3) requiring Defendants to recalculate Plaintiffs' JSA benefits in a manner consistent with ERISA's actuarial equivalence requirements; (4) requiring Defendants to increase the amounts of Plaintiffs' future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

### JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

14.     This Court has personal jurisdiction over Defendants because they each transact business in, or reside in, and have significant contacts with this District, and because ERISA provides for nationwide service of process.  Defendant FedEx is headquartered in this District, and, upon information and belief, the Investment Board and its members are also based in this District.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because FedEx does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### I.     Plaintiffs

16.     Plaintiff Robert A. Watt is a Plan participant who worked for FedEx for over 35 years.  Mr. Watt began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2022.  He is receiving a "Traditional Benefit" that was calculated using the UP-84 (with setbacks) and a 7% discount rate under Appendix B of the Plan and a "Flying Tiger" benefit that was calculated using the 1971 GAM (with setbacks) and a 6% discount rate under Appendix D of the Plan.

17.     Plaintiff Gary J. Friesen is a Plan participant who worked for FedEx for over 25 years.  Mr. Friesen began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2021. He is receiving a "Traditional Benefit" that was calculated using the UP-84 (with setbacks) and a 7% discount rate under Appendix B of the Plan.

7

18.     Plaintiff Michael H. McKenna is a Plan participant who worked for FedEx for over 22 years.  Mr. McKenna began receiving his Plan benefits as a 50% JSA, with his spouse as the beneficiary, in 2020. He is receiving a "Traditional Benefit" that was calculated using the UP-84 (with setbacks) and a 7% discount rate under Appendix B of the Plan.

19.     Plaintiff Geoffrey B. Coe is a Plan participant who worked for FedEx for over 26 years.  Mr. Coe began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2021. He is receiving a "Traditional Benefit" that was calculated using the UP-84 (with setbacks) and a 7% discount rate under Appendix B of the Plan.

## II.   Defendants

20.     FedEx is an American multinational holding company focused on transportation, e-commerce and business services. FedEx's businesses include, among others, its air delivery service, FedEx Express, and also FedEx Ground, FedEx Office (originally known as Kinko's), FedEx Supply Chain, FedEx Freight. FedEx is based in Memphis, Tennessee. FedEx is the sponsor of the Plan.

21.     The Plan defines the term "Administrator" to mean FedEx or its designee. Plan Document § 1.04.  According to the Plan, "[t]he Administrator of the Plan, acting through the Retirement Services Department of FedEx Corporate Services, Inc., shall have the sole power, duty, and responsibility of directing the administration thereof *in accordance with the provisions herein set forth and the requirements of the Code and ERISA*." (Emphasis added.) The Plan further states that, "[e]xcept to the extent delegated to a Committee in accordance with Section 7.02, *the Administrator shall have the sole and absolute right and power* to administer the *Plan in the best interests of Employees* including, but not limited to, the following powers and duties: . . . to . . . determine *the amount, manner*, and time of payment of, any benefits hereunder . . . ." Plan Document § 7.01. (Emphasis added.)

8

22.     FedEx is a "named fiduciary" and the "Plan Administrator" under ERISA §§ 402(a)(2) and 3(16)(A), 29 U.S.C. §§1102(a)(2) and 1002(16)(A).

23.     The Investment Board is the committee appointed by the Compensation Committee of the Board of Directors of FedEx Corporation to perform administrative duties under the Plan. The Plan fives the Investment Board "the sole and absolute right, power and authority necessary or incidental to the performance of such duties . . . ."  Plan Document at § 7.01. Upon information and belief, the Investment Board is an unincorporated association based in Memphis, Tennessee.

24.     The Investment Board is a "named fiduciary" and the "Plan Administrator" under ERISA §§ 402(a)(2) and 3(16)(A), 29 U.S.C. §§1102(a)(2) and 1002(16)(A).

25.     John/Jane Does 1-5 are the individual members of the Investment Board responsible for administrating the Plan during the Class Period.  Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### I.     Pension Benefit Options Must Be Actuarially Equivalent

26.     ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a qualified JSA (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment. A QJSA must be the default benefit for employees who are married.  ERISA §§ 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

27.     ERISA defines a QJSA as an annuity for the life of the participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  A QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1).  *Id.*  Accordingly, a plan can offer multiple QJSA options; that is, JSAs that

pay survivor benefits between 50% to 100%. *Id*.  A QJSA must be actuarially equivalent to the SLA that participants accrue under their plan. *Id*.

28.     Pension plans must also offer participants at least one other form of survivor annuity, known as a qualified optional survivor annuity ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2).  A QOSA is similar to a QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%.  The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2).  ERISA requires that QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

29.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the vested participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age.  ERISA § 205(e), 29 U.S.C. § 1055(e).  A QPSA must be actuarially equivalent to the benefit the surviving spouse would have received under the plan's QJSA. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

30.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which concerns alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

31.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." 26 C.F.R. § 1.401(a)-11(b)(2). Indeed, a QJSA "must be as least

as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16. Accordingly, if a plan offers other benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of those benefit options. The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20 Q&A 17.

32.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement. *See* ERISA § 205(g), 29 U.S.C. § 1055(g). But if they do, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be at least equal to the present value of the participant's benefits determined using the applicable mortality table (the "Treasury Mortality Table")[1] and applicable interest rates (the "Treasury Interest Rate")[2] (collectively, the "Treasury Assumptions"). The Treasury Assumptions are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

33.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.

34.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

---

[1] *See* 26 C.F.R. § 1.430(h)(2)-1.
[2] *See* 26 C.F.R. § 1.430(h)(3)-1.

## II.     Reasonable Factors Must Be Used When Calculating Actuarial Equivalence

35.     "Two modes of payment are actuarially equivalent when ***their present values are equal*** under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[3]

36.     Under ERISA, "present value" must "reflect anticipated events."  Present value adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

37.      The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

38.     A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

39.     The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. § 1.411(d)-3(g)(1) (emphasis added).

---

[3] According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent.  "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

40.     With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

41.     The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

42.     Like the Regulations and ERISA's definition of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board ("ASB")[4] of the American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions." *See* ASOP No. 27, § 3.6 ("each economic assumption used by an actuary should be reasonable"); *see also* ASOP No. 35, § 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

43.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "**special attention must be paid to the actuarial assumptions underlying the computations**." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd*, 719 Fed. Appx. 540 (8th Cir. 2018).  As the Ninth Circuit stated in *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000):

---

[4] The ASB, an independent entity created by the Academy in 1988, serves as the single board promulgating standards of practice for the entire actuarial profession in the United States.  The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants.

44.     The court explained in *Dooley v. Am. Airlines, Inc.* that each assumption used in an actuarial equivalence determination must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity. The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

45.     Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor participants should be better or worse off if participants select an SLA or a JSA.  *See Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005).

46.     "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."  Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

## SUBSTANTIVE ALLEGATIONS

## I.     The Plan

47.     The Federal Express Corporation Employees' Pension Plan (the "Express Plan") became effective June 1, 1978. The Express Plan was amended and restated, generally effective

May 31, 2001, to effectuate the merger of the FedEx Ground Package System, Inc. and Certain Affiliates Career Reward Pension Plan (the "Ground Plan'") into the Express Plan, with the resulting plan being the Plan.

48.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

49.     The benefits of FedEx pilots are determined in accordance with the provisions of Appendix B to the Plan and Appendix D for pilots employed by Flying Tiger Line Inc. before it merged with Federal Express.

50.     Under Appendix B, participants earn an "accrued benefit" based on their compensation and years of service payable at their "Normal Retirement Age." Plan Document, Appendix B at § 1.01.

51.     The "Normal Form of Payment" under Appendix B is "a single life annuity, payable monthly to the Participant during his lifetime." *Id*. at § 4.02(a).

52.     The "Normal Retirement Age" is age 60, which is increased to age 62 for benefits earned after February 1, 2016. *Id*. at § 1.47.

53.     For a participant who retires early, benefits are reduced because the participant can be expected to receive benefits for a longer time and, therefore, be expected to receive more benefit payments. Accordingly, the Plan reduces the accrued benefit for participants that begin receiving their benefits before the applicable Normal Retirement Age (those taking early retirement) by .25% per month (3% per year). *Id*. at 3.06(b)(2).

54.     Appendix B provides that for married participants, benefits "shall be paid in the form of a Qualified Joint and Survivor Annuity." *Id*. at § 4.02(b).  In other words, for married participants, the SLA that participants earned (reduced if they retire early) is converted to a QJSA.

55.     The Plan and Appendix B offered three joint and survivor annuities (50%, 75%, and 100%), *each* of which the Plan defines as a "Qualified Joint and Survivor Annuity." The Plan states, in relevant part:

> "Qualified Joint and Survivor Annuity" **shall mean** a monthly benefit payable to the Participant for his lifetime with a monthly benefit following the death of the Participant payable to his Spouse and continuing for the life of such Spouse equal to [1] fifty percent (50%) of the amount of the monthly benefit payable during the joint lives of the Participant and his Spouse, **or** . . . [2] seventy-five percent (75%) **or** [3] one hundred percent (100%) of the monthly amount payable to the Participant continuing for the life of the Spouse.

*Id.* at § 1.53 (Emphasis added.)

56.     The Plan allows married participants to select an "Option Form of Benefit" "with consent of his spouse, if applicable." *Id*. at § 4.02(c).

57.     The 50% QJSA is the default form of benefit for married participants, meaning that it is the form used when a participant does not select a form of benefit. It is also used to determine the QPSA that is paid to a participant's surviving spouse if the participant dies before starting to receive benefits.  *Id*. at §§ 1.53 and 5.02.  But the Plan allows married participants to select the 75% or 100% QJSA *without* their spouse's consent. The Plan states, in relevant part:

> Participant may, at any time before his Annuity Starting Date and **without any requirement of Spousal consent**, elect in a writing submitted to the Plan Administrator to substitute either a **seventy-five percent (75%) or one hundred percent (100%) Qualified Joint and Survivor Annuity** for the fifty percent (50%) Qualified Joint and Survivor Annuity.

*Id*. at § 4.02(c) (Emphasis added).

58.     To convert the SLA that the married participant accrued to the 50%, 75%, and 100% QJSA, the Plan uses "the UP-1984 Mortality Tables for Participants and rated back three

(3) years for all Beneficiaries and with interest at seven percent (7%) per annum." *Id*. at § 1.02(c). As explained below, these assumptions were unreasonable and produced QJSA benefits that were not "the actuarial equivalent of a single annuity for the life of the participant" like ERISA requires.

59.     Appendix D of the Plan contains the benefit formula for participants that were employed by Flying Tiger Line Inc. before it merged with Fed Ex.  Plan Document, Appendix D at Article I. Under the old Flying Tiger Plan, participants earn a benefit in the form of a single life annuity but the normal form of benefit for married participants is a 50% QJSA.  *Id*. at Article VI and Article X(b).  Participants can also select a 75% or 100% QJSA.

60.     To convert a participant's SLA to the 50%, 75% or 100% QJSA, the Plan uses a 6% discount rate and an unspecified table of mortality rates in Exhibit I to Appendix D that show the likelihood a participant or beneficiary will die at each age.  *Id*. at Article II.01 and Exhibit I. The mortality rates in Exhibit I are significantly higher than those in reasonable, current mortality tables, and assume a higher likelihood of mortality.  Appendix D does not identify the mortality table that was used to generate the rates in Exhibit I, but the Plan's Form 5500 says it is the 1971 GAM.  Appendix D also uses a 6-year setback for beneficiaries, an adjustment that exacerbates the effects of using high mortality rates, and further reduces the conversion factor.

61.     For those that participated in what Appendix D describes as the "Group II Tiger Plans," a term that includes the plans under which pilots employed by Flying Tiger Line, Inc. earned benefits, the Plan offers a 50% QJSA "without adjustment for the cost of the survivor portion," i.e., fully subsidized.  Plan Document, Appendix D at Article X(b).  In other words, the Plan offers a **50%** QJSA that pays the same amount would be payable to the same participant as an SLA.  But the Plan uses the mortality rates generated by the 1971 GAM and a 6% discount rate to calculate the **75%** and the **100%** QJSAs for pilots in the Group II Tiger Plans and all QJSAs for

any pilots in the **Group I** Tiger Plans.  *Id*.  For non-pilots whose benefits are calculated under Appendix D, Defendants have used the Treasury Assumptions since February 1, 2012.  *Id*. at Article II.01.

## II.      The Plan's QJSAs for Pilots Do Not Satisfy ERISA's Actuarial Equivalence Requirements

### A.  Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated

62.     As discussed above, to compare the present values of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present values of the **aggregate** (*i.e.,* total) future benefits the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There are two main components of these present value calculations: (1) an interest rate and (2) the mortality table applied to participants and beneficiaries.

63.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment.  *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003).  ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

64.     The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." ERISA § 3(27, 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment.  *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

65.     As alleged above, under § 3.6 of ASOP No. 27,[5] "each economic assumption used by an actuary should be reasonable."[6] An assumption is deemed "reasonable" if it "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, § 3.6 (emphasis in original). The Treasury Interest Rates are reasonable because they are updated to reflect current economic conditions.

66.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

67.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth.

68.     The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these calculations. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

69.     Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:

---

[5] Courts look to professional actuarial standards as part of this analysis. *See, e.g., Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield); *see also McDaniel*, 203 F.3d at 1110 (citing American Academy of Actuaries' publication).

[6] Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this paper, there have been "increasing life expectancies over time" and just moving from the RP-2000 mortality table to the 2014 table would substantially increase projected morality and, therefore, increase pension liabilities by 7%.

70.     Under § 3.5.3 of ASOP 35, mortality tables must be adjusted on an ongoing basis to reflect improvements in mortality.[7]

71.     Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.[8] For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements

---

[7] *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

[8] Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

in mortality since publication of the table. IRS Notice 2016-50.[9]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[10]

72.    For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002(27).  The Treasury Mortality Tables are updated to reflect recent mortality data from participants in private pension plans. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).  Accordingly, the Treasury Assumptions are reasonable.

73.    Using a reasonable interest rate and mortality table, the present values of the SLA and the other forms of benefit can be compared to determine whether those forms of benefit are actuarially equivalent to the SLA.  Pension plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce actuarially equivalent benefits for participants and beneficiaries.

## B.  The Plan's Assumptions Do Not Produce Actuarially Equivalent JSA Benefits in Violation of ERISA.

74.    Throughout the relevant period, FedEx used the UP-84 mortality table with setbacks and 7% to calculate the QJSAs and QPSAs under the Plan.

75.    The use of these assumptions does *not* produce QJSAs that are actuarially equivalent to the SLA offered to participants when they commence benefits under the Plan because the present values of the QJSAs are lower than the present values of the SLAs.  The Plan's use of UP-84 mortality table with setbacks and 7% likewise does not produce QPSAs that meet ERISA's actuarial equivalence requirements.

---

[9]  *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.

[10] *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

76.     Defendants' use of actuarial assumptions was unreasonable because the UP-84 is outdated and does not "reflect anticipated events" (i.e., the anticipated mortality rates of participants). The UP-84 was published in 1976 and is ***based on experience data from the 1960s*** that do not incorporate improvements in life expectancy that have occurred since that time. For example, a 65-year-old male is expected to live an additional 15.4 years (i.e., until age 80.4) under the UP-84 but an additional 21.6 years (i.e., until age 81.6) under the RP-2014. Thus, the average employee expects to receive, and the average employer expects to pay, benefits for a substantially longer period given the improvements in mortality that have occurred since the UP-84 was published.

77.     Because the UP-84 overstates mortality rates, it results in lower conversion factors than those produced using a reasonable mortality assumption. The setbacks that FedEx used to generate the Plan's tabular factors fails to incorporate the improvements in mortality that have occurred and artificially reduces the conversion factor by using an age that is lower than the beneficiary's actual age.

78.     The Plan's assumptions used to calculate 50%, 75% and 100% QJSAs have not been changed in many years.  These assumptions produce benefits that are not actuarially equivalent to the amount of the SLA benefit.  This is true for each participant that selects a 50%, 75% or 100% QJSA under the Plan, regardless of the participant's age or when benefits commenced.

79.     Defendants exacerbated the differences between mortality rates in the UP-84 and current mortality tables by using a 3-year setback for participants, which further increased the underpayments.

80.     A "setback" subtracts a specified number of years from a standard mortality table for purposes of calculating benefits. For example, if there is a 65-year-old retiree who has a spouse that is also 65, but the plan states that there is a 3-year setback for beneficiaries, then, for purposes of calculating benefits, the plan uses age 62 for the beneficiary's age.

81.     The Plan's 3-year setback for beneficiaries reduces the conversion factor below what it would have been if no setback had been applied. The "setback" modification, accordingly, exacerbates the injury caused by using the antiquated UP-84.

82.     The 3-year setback is not reasonable because it does not reflect participants' spouses' anticipated mortality when used with the UP-84.  If FedEx had used a reasonable mortality assumption, such as the one it uses to calculate the Plan's liabilities, it would not need to use a setback, especially an unreasonable one like the 3-year setback that the Plan uses.

**III.    The Defendants' use of unreasonable assumptions caused Plaintiffs' and the Class's joint and survivor benefits to not be the actuarial equivalent of the single life annuity offered.**

83.     Plaintiffs' and the Class's benefits are ***substantially lower*** (i.e., worse for participants) than those generated using reasonable actuarial assumptions such as the applicable Treasury Assumptions.

84.     While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary at the time of retirement, and on the percentage of the JSA, all participants receiving 50%, 75%, and 100% JSAs under the Plan are not receiving actuarially equivalent forms of benefit because the present values of those benefits are not equal to the present values of the SLAs they could have taken at the times they retired.

85.     By applying unreasonable, antiquated actuarial assumptions (i.e., the UP-84 with setbacks and the 7% interest rate and the 1971 Group Annuity Mortality Table ("1971 GAM") with

setbacks and a 6% interest rate) — to calculate participants' JSAs, Defendants are causing participants to receive lower monthly payments than they should be receiving had reasonable formulae.

86.     Upon information and belief, Defendants have not updated the discount rate used to calculate QJSA benefits in many years for pilots whose benefits are calculated under Part B of the Plan.

87.     Defendants can and do use updated reasonable actuarial assumptions when calculating benefits under other parts of the plan. Moreover, they consistently update these assumptions to calculate QJSAs, QOSAs and QPSAs to ensure that they are reasonable.

88.     For example, since 2012, the Plan has used the Treasury Assumptions to calculate Non-Crew Member QJSAs, QOSAs and QPSAs.  Plan Document at § 1.02(d). Defendants update these assumptions every year to ensure that only current, reasonable actuarial assumptions are used to calculate Non-Crew Member benefits.

89.     By using unreasonable assumptions, the Plan incentivizes early retirement for pilots. As discussed above, the Plan reduces the by .25% per month (3% per year) for those that take early retirement.  *Id*. at 3.06(b)(2). This reduction is less than the reduction that would result from calculating the reduction using reasonable actuarial assumptions such as the Treasury Assumptions used for Non-Crew Member benefits.  Accordingly, the Plan purposefully offers a subsidized early retirement benefit; that is, reducing the SLA by less than an amount that would be actuarially equivalent, presumably to encourage participants to retire before the Normal Retirement Age.

90.     The Plan further incentivizes early retirement by offering QJSAs, QOSAs and QPSAs at Normal Retirement Age that are not actuarially equivalent to the SLA at Normal

Retirement Age because they are calculated using outdated and unreasonable actuarial assumptions as Defendants have done in this case.

91.     While it is proper to incentivize a pilot's early retirement through a subsidized early retirement benefit, it is not legal under ERISA to further incentivize early retirement by offering benefits at Normal Retirement Age that are too low.

92.     Moreover, although FedEx used the unreasonable UP-1984 and 7% assumptions to calculate QJSA and QPSA benefits, FedEx uses reasonable, contemporary actuarial assumptions to calculate the present value of its benefit obligations under the Plan for financial reporting purposes. For purposes of its filings with the U.S. Securities and Exchange Commission ("SEC"), FedEx's audited financial statements are prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"), pursuant to which, actuarial assumptions must reflect the "best estimate" for that assumption as of the current measurement date.[11]

93.     In its SEC filings, the FedEx represented that for financial reporting purposes, its "defined benefit pension and postretirement benefit plans are measured using actuarial

---

[11] For example, as noted in a "Financial Reporting Alert" by Deloitte:

> This publication highlights some of the important accounting considerations related to the calculations and disclosures entities provide under U.S. GAAP in connection with their defined benefit pension and other postretirement benefit plans.
> ***
> **Mortality Assumption**
> …Frequently, actuaries recommend published tables that reflect broad-based studies of mortality.  Under ASC[11] 715-30 and ASC 715-60, ***each assumption should represent the "best estimate" for that assumption as of the current measurement date***. Entities should consider whether the mortality tables used and adjustments made (*e.g.*, for longevity improvements) are appropriate for the employee base covered under the plan.

*See* Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 21-3, December 3, 2021, at 6 (emphasis added).

techniques that **reflect management's assumptions**" of, among other things, "discount rate, and demographic experience such as . . . mortality."

94.     For example, for the 2020 calendar year, FedEx calculated the present value of pension benefits using "the Pri-2012 annuitant tables without collar adjustment and with MMP-2019 mortality improvement scale" and a 3.143% discount rate. FedEx represented in its SEC filings that these assumptions were used in its audited consolidated financial statements included on Form 10-K for the fiscal year ended May 31, 2020.[12]

95.     The Pri-2012 mortality tables uses data that is reasonable because it is relatively current. The Pri-2012 mortality tables were released by the Society of Actuaries' (SOA) Retirement Plans Experience Committee (RPEC) in 2019. According to the SOA, the mortality experience in the final Pri-2012 dataset came almost exclusively **from calendar years 2010 through 2014**.

96.     In other words, Defendants use current, reasonable mortality tables to calculate the value of benefits for reporting financial results to the government, but they use outdated, unreasonable mortality data — that is approximately **50 years older** than the Pri-2012 data — when calculating joint and survivor benefits payable to its pilots.

97.     Defendants also continually update the discount rate used to calculate benefit obligations in its financials filed with the SEC. The Company described its process for determining the discount rate as follow: "We determine the discount rate (which is required to be the rate at which the projected benefit obligation ("PBO") could be effectively settled as of the measurement date) with the assistance of actuaries, who calculate the yield on a theoretical portfolio of high-

---

[12] https://www.sec.gov/Archives/edgar/data/1048911/000120677420002373/fdx3718221-def14a.htm

grade corporate bonds (rated Aa or better) with cash flows that are designed to match our expected benefit payments in future years."

98.    The Company updates discount rate used to calculate projected benefit obligations *every* year with the assistance of its actuaries. These rates are as follows:

| Fiscal year | Discount rate |
|:-----------:|:-------------:|
| 2023 | 5.20% |
| 2022 | 4.25% |
| 2021 | 3.23% |
| 2020 | 3.14% |
| 2019 | 3.85% |
| 2018 | 4.27% |
| 2017 | 4.08% |
| 2016 | 4.13% |

99.    Throughout the relevant period, FedEx used updated actuarial assumptions in its financial statements to report a greater liability for the benefits the Plan paid out to participants than those used in the formulae for determining the JSA benefits that were actually paid to participants. There is no reasonable justification for Defendants to use the UP-84 with setbacks and a 7% interest rate, which produce unfairly low QJSA benefits actually paid to participants, while at the same time using up-to-date, reasonable actuarial assumptions that reflect the contemporary conditions for projecting benefit costs in annual financial reporting.

100.    Because these two analyses — determining Plan liabilities and determining plan benefits actually paid to participants — measure the payment of the same benefit streams over the length of the same lives, they should be determined using the same actuarial assumptions.

101.    "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794

F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000). The Plan's formulae for determining JSA benefits do ***not*** reflect "characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110.

102.   During the relevant period, Defendants used antiquated and unreasonable actuarial assumptions, to undervalue JSA benefits. Had the Plan used reasonable actuarial assumptions — such as the Treasury Assumptions or the assumptions FedEx used to calculate the Plan's liabilities, or a combination of the two — Plaintiffs and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

103.   Discovery and expert analyses will likely show that Defendants' use of unreasonable factors to generate JSA benefits deprived retirees and their spouses of millions of dollars.

104.   Plaintiff Robert A. Watt started receiving benefits at age 64 and his wife was age 62.  He selected a 100% JSA to receive his Traditional Benefit, which pays $9,669.48 per month and was calculated under Appendix B of the Plan and the UP-84 (with setbacks) and a 7% discount rate. However, if his benefits were calculated using the Treasury Assumptions, his monthly benefit would increase to $10,203.36 — an increase of $533.88 per month or 5.52%. Through their use of unreasonable assumptions to determine JSA benefits, ***Defendants have reduced the present value of Mr. Watt's Traditional Benefit under the Plan by more than $123,769***.

105.   Mr. Watt also earned a benefit under the Flying Tigers part of the Plan that he is receiving as a 100% JSA that pays him $199.82 per month.  However, if his benefits were calculated using the Treasury Assumptions, like they are for non-pilots, his monthly benefit would increase to $221.49 – an increase of $21.67 per month or 10.84%.  Through their use of

unreasonable assumptions to determine his Flying Tiger JSA benefit, ***Defendants have reduced the present value of Mr. Watt's Flying Tiger benefit under the Plan by more than $5,023***.

106.   Plaintiff Gary J. Friesen started receiving benefits at age 61 and his wife was age 62.  He selected a 100% JSA, which pays $9,002.06 per month. However, if his benefits were calculated using the Treasury assumptions, his monthly benefit would increase to $9,460.75 — an increase of $458.69 per month or 5.1%. Through their use of unreasonable assumptions to determine JSA benefits, ***Defendants have reduced the present value of Mr. Friesen's pension benefits by more than $111,871***.

107.   Plaintiff Michael H. McKenna  started receiving benefits at age 64 and his wife was age 66.  He selected a 100% JSA, which pays $8,589.25 per month. However, if his benefits were calculated using the Treasury assumptions, his monthly benefit would increase to $8,883.16 — an increase of $293.91 per month or 3.42%. Through their use of unreasonable assumptions to determine JSA benefits, ***Defendants have reduced the present value of Mr. McKenna's pension benefits by more than $57,317***.

108.   Plaintiff Geoffrey B. Coe started receiving benefits at age 66 and his wife was age 51.  He selected a 100% JSA, which pays $5,855.31 per month. However, if his benefits were calculated using the Treasury assumptions, his monthly benefit would increase to $5,944.83 — an increase of $89.52 per month or 1.53%. Through their use of unreasonable assumptions to determine JSA benefits, ***Defendants have reduced the present value of Mr. Coe's pension benefits by more than $24,124***.

109.   Because their benefits were calculated using the UP-84 with setbacks and a 7% interest rate and the 1971 Group Annuity Mortality Table ("1971 GAM") with setbacks and a 6% interest rate, each of the Plaintiffs have been harmed. They are each receiving less each month than

they would have received if the Plan used reasonable, up-to-date actuarial assumptions, like ERISA requires. Plaintiffs, along with each other class member, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount in violation of ERISA.

110.    In short, Defendants failed to provide JSAs that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA § 205(d), 29 U.S.C. § 1055(d). By using unreasonable formulas based on antiquated actuarial assumptions, Defendants have materially reduced the monthly benefits that participants and beneficiaries under the Plan receive in comparison to the monthly benefits they would receive if Defendants used factors based on updated, reasonable actuarial assumptions.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants and beneficiaries entitled to benefits under Appendix B and/or Appendix D of the Plan who began receiving a 50%, 75% or 100% JSA or a QPSA on or after September 18, 2017, whose benefits had a present value that was less than the present value of the SLA they were offered using the applicable Treasury Assumptions as of each participant's Benefit Commencement Date. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

112.    The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons. According to the Plan's most recent Form 5500, there are 25,238 retired or separated participants receiving benefits under the entire Plan; pilots make up approximately 3.6% of FedEx's employee headcount; and FedEx's actuary assumes that 50% of retiring pilots will select a QJSA. Accordingly, it is reasonable to infer there are at least several hundred retired pilots receiving joint and survivor benefits under Appendix B and Appendix D of the Plan.

113.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

114.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    A.    Whether the Plan's existing assumptions provide 50%, 75% and 100% JSAs and QPSA benefits that are actuarially equivalent to the SLA offered to participants;

    B.    Whether the Plan's assumptions for calculating JSA benefits are reasonable;

    C.    Whether Plaintiffs and Class members should have their benefits recalculated to conform with ERISA's actuarial equivalence requirements; and

    D.    Whether Plaintiffs and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

115.     Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  They are each committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

116.     This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1).   Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.   Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

117.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

118.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA §§ 205, 502(a)(3), 29 U.S.C. §§ 1055, 1132(a)(3))**

119.     Plaintiffs re-allege and incorporate by reference all prior allegations in this Amended Complaint.

120.     Defendants have improperly reduced JSAs for participants and beneficiaries of the Plan below the amounts that they would receive if those benefits were actuarially equivalent to an SLA in violation of ERISA § 205, 29 U.S.C. § 1055.

121.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

122.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies used by Defendants for calculating the actuarial equivalence of JSAs violate ERISA because they do not provide an actuarially equivalent benefit, as required by ERISA § 205(d), 29 U.S.C. § 1055(d).

123.    Plaintiffs seek an order from the Court providing a full range of equitable relief, including but not limited to:

(a)    re-calculation, correction, and payment of QJSA and QPSA benefits previously paid under the Plan;

(b)    an "accounting" of all prior benefits and payments;

(c)    an equitable surcharge;

(d)    disgorgement of amounts wrongfully withheld;

(e)    disgorgement of profits earned on amounts wrongfully withheld;

(f)    a constructive trust;

(g)    an equitable lien;

(h)    an injunction against further violations; and

(i)    other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

124.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

125.    FedEx and the Investment Board are fiduciaries of the Plan.

126.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding of fiduciary status when the statutory test is met.

127.    The Investment Board and its members are fiduciaries for the Plan because throughout the Class Period they exercised discretionary authority or control respecting the management of the Plan, and/or exercised authority or control over the management or disposition of the Plan's assets, and/or have had discretionary authority or discretionary responsibility in the administration of the Plan.  Among other things, during the Class Period, the Investment Board

had authority or control over the determination of the amount and payment of benefits from the Plan.

128.    FedEx is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the "Administrator" of the Plan and because it exercised discretionary authority or control with respect to the management of the Plan, and/or exercised authority or control over management or disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan, including, but not limited to, its duty to appoint and monitor members of the Investment Board.

129.    ERISA charges fiduciaries with among the highest duties known to law. These duties are set down in ERISA § 404, 29 U.S.C. § 1104, which states, in relevant part, the following:

(a) Prudent man standard of care

(1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, *prudence*, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . ; and

(D) in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III. . . .*

29 U.S.C. § 1104 (a)(emphasis added).

130.    As alleged above, under the terms of the Plan document, Fed Ex and the Investment Board had the sole power, duty, and responsibility to direct the administration of the Plan in accordance with the requirements of the Tax Code and ERISA.

131.    The Plan's terms are not consistent with ERISA because the Plan uses unreasonable formulae to calculate QJSAs and QPSAs that do not provide actuarially equivalent benefits in violation of ERISA's actuarial equivalence requirements. As a result, participants and beneficiaries do not receive the actuarially equivalent benefits ERISA require and lose vested benefits in violation of ERISA.

132.    Here, Defendants breached their fiduciary duties by, among other reasons, directing the administration of the Plan in violation of ERISA.

133.    ERISA further imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA.  In allowing the Investment Board to pay benefits that were not actuarially equivalent, in violation of ERISA, Defendant FedEx breached its fiduciary duty to supervise and monitor the Investment Board and/or its delegatees.

134.    As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plan have lost, and are continuing to lose, millions of dollars in vested accrued pension benefits.

135.    FedEx, the Investment Board, and its members, are jointly liable for the acts of the other as co-fiduciaries for the Plan.

136.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

137.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established

methodologies for calculating QJSAs and QPSAs do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value to the SLA as required under ERISA.

138.    Plaintiffs further seek orders from the Court providing a full range of equitable relief including but not limited to:

(a)    re-calculation, correction, and payment of actuarially equivalent JSA and QPSA benefits previously paid under the Plan;

(b)    an "accounting" of all prior benefits and payments;

(c)    an equitable surcharge;

(d)    disgorgement of amounts wrongfully withheld;

(e)    disgorgement of profits earned on amounts wrongfully withheld;

(f)    a constructive trust;

(g)    an equitable lien;

(h)    an injunction against further violations; and

(i)    other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declare that the Plan has failed, and continues to fail, to properly calculate and pay JSA and QPSA benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.    Order Defendants to correct and recalculate QJSA and QPSA benefits that have been paid under the Plan;

D.      Order Defendants to provide an "accounting" of all prior payments of JSA and QPSA benefits under the Plan to determine the proper amounts that should have been paid;

E.      Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.      Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.      Impose a constructive trust;

H.      Impose an equitable lien;

I.      Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Award, declare, or otherwise provide Plaintiff and the Class with all relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.      Award to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief or remedy the Court determines is just and proper.


Dated:  September XX, 2023.                    Respectfully submitted,


                                        /s DRAFT
                                        _____
                                        JOHNSON & BENNETT, PLLC
                                        Kristy L. Bennett, Esq. (BPR #30016)
                                        Tressa V. Johnson, Esq. (BPR #26401)
                                        1407 Union Avenue, Ste. 807
                                        Memphis, TN 38104
                                        (901) 402-6601
                                        kristy@myjbfirm.com
                                        tressa@myjbfirm.com

IZARD, KINDALL & RAABE LLP
Robert A. Izard (*pro hac vice* forthcoming)
Douglas P. Needham (*pro hac vice* forthcoming)
Christopher M. Barrett (*pro hac vice* forthcoming)
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
rizard@ikrlaw.com
dneedham@ikrlaw.com
cbarrett@ikrlaw.com

*Attorneys for Plaintiffs*